1   MERYL L. YOUNG (CA SBN 110156)          PETER E. PERKOWSKI (CA SBN 199491)
    myoung@gibsondunn.com                    pperkowski@winston.com
2   GIBSON, DUNN & CRUTCHER LLP              WINSTON & STRAWN LLP
    3161 Michelson Drive                     333 S. Grand Avenue
3   Irvine, CA 92612-4412                    Los Angeles, CA 90071-1541
    Telephone: (949) 451-3800                Telephone: (213) 615-1819
4   Fax: (949) 451-4220                      Fax: (213) 615-1750

5   JOSH A. KREVITT (CA SBN 208552)          JAMES F. HURST (admitted *pro hac vice*)
    jkrevitt@gibsondunn.com                  jhurst@winston.com
6   (admitted *pro hac vice*)                MICHAEL L. BRODY (admitted *pro hac vice*)
    SCOTT A. LESLIE (admitted *pro hac vice*) mbrody@winston.com
7   sleslie@gibsondunn.com                   WINSTON & STRAWN LLP
    GIBSON, DUNN & CRUTCHER LLP              35 W. Wacker Drive
8   200 Park Avenue                          Chicago, Illinois 60601-9703
    New York, NY 10166-0193                  Telephone: (312) 558-5600
9   Telephone: (212) 351-4000                Fax: (312) 558-5700
    Fax: (212) 351-4035
10                                           PETER J. CHASSMAN (admitted *pro hac vice*)
    Attorneys for Plaintiffs APPLE INC. and  pchassman@winston.com
11  APPLE SALES INTERNATIONAL                WINSTON & STRAWN LLP
                                             1111 Louisiana, 25th Floor
12                                           Houston, Texas 77002-5242
                                             Telephone: (713) 651-2600
13                                           Fax: (713) 651-2700

14                                           Attorneys for Defendant MOTOROLA
                                             MOBILITY LLC (f/k/a Motorola Mobility, Inc.)
15

16                    **UNITED STATES DISTRICT COURT**

17                   **SOUTHERN DISTRICT OF CALIFORNIA**

18
    APPLE INC. and APPLE SALES           CASE NO. 3:12-CV-00355-GPC-BLM
19  INTERNATIONAL,

20                          Plaintiffs,   **JOINT RULE 26(f) REPORT AND
                                          DISCOVERY PLAN**
21      vs.

22                                        Case Management Conference

23  MOTOROLA MOBILITY LLC,                Date:          October 31, 2012
                                          Time:          9:30 a.m.
24                          Defendant.    Magistrate Judge:  Hon. Barbara L. Major

25

26                         **REDACTED PUBLIC VERSION**

27

28

Pursuant to the Court's September 26, 2012, Order Directing Rule 26 Compliance and Setting Case Management Conference (the "Order") and Federal Rule of Civil Procedure 26(f), Plaintiffs Apple Inc. and Apple Sales International (collectively, "Apple") and Defendant Motorola Mobility LLC ("Motorola") conducted a Rule 26(f) conference on Wednesday, October 10, 2012, as well as a follow-up conference on Tuesday, October 16, 2012, and hereby submit this Joint Rule 26(f) Report and Discovery Plan.

## I.   Joint Discovery Plan

### A.   Initial Disclosures

Pursuant to the Court's Order, as amended by order on October 18, 2012, the parties will serve initial disclosures under Federal Rule of Civil Procedure 26(a)(1) on or before Wednesday, October 24, 2012.  The parties do not at this time anticipate the need to alter the timing, form, or requirement for disclosures under Rule 26(a).

### B.   Subjects and Timing of Discovery

#### 1.   Apple's Position

Apple contends that little, if any, discovery is needed to resolve this straightforward contract dispute.  To the extent discovery is required, it should be targeted and specific, and should take place over the course of three months.  Motorola, however, argues that discovery should be "substantial," and advocates for a lengthy, indeterminate discovery period so that it can delay the prompt resolution of this case.

The issues here are simple.  Motorola and Qualcomm have a patent license agreement.  Apple is a third-party beneficiary of that agreement, and ███████████████████████████████ ███████  This is not in serious dispute, and even if it were, it would not prompt significant discovery. The fundamental question, then, is whether Motorola can ████████████████████████████. Under the plain terms of the contract, it cannot.  █████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████

Gibson, Dunn & Crutcher LLP

Joint Rule 26(f) Report and Discovery Plan                    CASE NO.: 12-cv-00355-GPC-BLM

1    The parties agree on the contractual provisions at issue here, and those provisions are not at

2    all ambiguous or unclear. ███████████████████████████████████████

3    ██████████████████████████████████████████████████████████████

4    ████████████████████████    Those facts will not change no matter how much discovery

5    Motorola seeks.  In an effort to avoid these straightforward facts, Motorola argues that a host of

6    tangential, supposedly time-consuming discovery is needed so that it can pursue arguments that have

7    no bases in the agreement's plain language.  Motorola provides four "examples" of such supposedly

8    necessary discovery, little of which is necessary and none of which needs to be time consuming:

9    •   ████████████████████████████████████████████████████████

10       ████████████████████████████████████████████████████████

11       ████████████████████████████████████████████████████████

12       ████████████████████████████████████████████████████████

13       ████████████████████████████████████████████████████████

14       ████████████████████████████████████████████████████████

15       ████████████████████████████

16   •   **<u>Intent</u>**.  Notwithstanding the fact that the contract is unambiguous, Motorola claims that

17       substantial discovery is required to determine the intent of Qualcomm and Motorola in

18       entering into the agreement.  But that discovery also is not needed.  Motorola points to no

19       ambiguity in the agreement, and the terms of the agreement are not reasonably susceptible to

20       differing meanings.  *See Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 343, 83 P.3d 497,

21       501-02 (Cal. 2004) (explaining that the parol evidence rule allows the introduction of

22       extrinsic evidence "to explain the meaning of a written contract . . . [if] the meaning urged is

23       one to which the written contract terms are reasonably susceptible.")  While "[t]he

24       fundamental goal of contractual interpretation is to give effect to the mutual intention of the

25       parties," "[s]uch intent is to be inferred, if possible, solely from the written provisions of the

26       contract.  If contractual language is clear and explicit, it governs."  *County of San Diego v.*

27       *Ace Property & Cas. Ins. Co.*, 37 Cal.4th 406, 415, 118 P.3d 607, 612-13 (Cal. 2005)

28       (citations omitted); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern

Gibson, Dunn &
Crutcher LLP

Joint Rule 26(f) Report and Discovery Plan          CASE NO.: 12-cv-00355-GPC-BLM

its interpretation, if the language is clear and explicit, and does not involve an absurdity.") Motorola offers no sound reason to depart from the agreement's clear and explicit language here.  And, again, Motorola does not explain how investigation of intent requires a prolonged discovery period.  At issue is a *single* contract, with presumably a discrete set of involved individuals and similarly confined negotiation record.

- **Exhaustion**.  Motorola's purported need for substantial discovery concerning Apple's claim for patent exhaustion (Count 5) is exaggerated.  Even if such discovery is needed, it should be obtained quickly and efficiently, for example through focused interrogatories and/or document requests concerning Apple's, or its contract manufacturers', purchase orders for Qualcomm components.

- **Damages**.  Given that liability is straightforward here, in order to streamline the case, Apple suggests bifurcating the damages portion of the case from the liability portion.  This proposal is an effort to simplify the proceedings for the Court and the parties so that liability may be resolved promptly.  Motorola contends that it requires detailed discovery of Apple's damages in order to defend against Apple's claims, and opposes bifurcation on those grounds.  If damages are as complex and contested as Motorola contends, all the more reason to bifurcate.  Even without bifurcation, though, discovery here should be limited and focused.  As Apple alleged in its Second Amended Complaint, Apple's harm is derived at least in part from its expectation to use the Qualcomm chips free of litigation costs, and "Apple's expectation damages are the cost of defending itself in any litigation against Motorola."  (Second Am. Compl. ¶ 66.)  There is therefore no question that "Apple has incurred and will continue to incur harm as the result of Motorola's anticipatory breach of contract by repudiation."  (*Id.*)  Motorola's attempt to delay judgment on liability based on a purported need for detailed damages discovery is unavailing.  Motorola has not put forth any reason why issues surrounding Apple's damages in particular require the lengthy discovery period it proposes.

Apple and Motorola have been engaged in various disputes in other forums.  To facilitate discovery in those cases, the parties previously entered into a Cross-Use Agreement (dated April 6, 2011) that allows for documents and testimony to be used across actions.  During the Rule 26(f)

conference for this case, the parties discussed potentially utilizing this prior discovery with limited re-production of materials.  Motorola opposes such use to the extent it would result in Apple "point[ing] to the millions of pages of irrelevant production in other cases as a basis for rushing this case to trial without an adequate discovery period."  But that is not Apple's intent.  Apple has proposed possible cross-use of discovery materials in order to avoid unnecessary duplication of work and lengthy document production efforts where relevant materials have already been gathered and exchanged between the parties.  Obviously, such cross-use would require further coordination among the parties to implement so that discovery in this case is efficient, expeditious, and fair.  Apple therefore proposes that the parties continue to discuss this topic.

Apple further contends that certain of the discovery topics enumerated by Motorola can be addressed via factual stipulation by the parties.  In order to expedite the discovery process, Apple believes that the parties should meet and confer to also discuss possible subjects for such stipulation.

### 2.   Motorola's Position

Apple has brought this multi-count case, resting on numerous allegations other than the language of the contract between Qualcomm and Motorola and implicating numerous issues other than the language of the contract that will necessitate substantial discovery of the parties and non-parties.  Motorola is entitled to a full discovery period to develop the record in order to properly defend itself in this case, rather than the rush to judgment that Apple proposes after an inadequate, three-month discovery period.

Apple has alleged that Motorola has breached its agreement with Qualcomm by ████████

██████████████████████████████████████████████████████████████████████████

████████████████     Motorola disputes Apple's allegations.     ████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████ This dispute implicates discovery

3 concerning the intent behind agreement between Motorola and Qualcomm. █████████

4 ██████████████████████████████████████████████████████████

5 ███████████████████

6          Those disputes will necessitate discovery concerning the intent of Motorola (or, more

7 properly, a predecessor company) and Qualcomm in entering the agreement. California law is clear

8 that relevant extrinsic evidence of intent may be used when interpreting a contract.  *See DVD Copy*

9 *Control Ass'n v. Kaleidescape, Inc.*, 176 Cal. App. 697, 712 (Cal. App. 2009)) (Extrinsic evidence

10 admissible to explain the meaning of a contract if the language contract is fairly susceptible of either

11 one of the two interpretations) (citations, quotation marks, ellipses, and brackets omitted); *Kashmiri*

12 *v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 832 (Cal. App. 2007) ("[W]e look to the

13 reasonable expectation of the parties at the time of contract.  To determine the reasonable expectation

14 of the parties we examine the totality of the circumstances.  Agreement may be shown by the acts and

15 conduct of the parties, interpreted in the light of the subject matter and of the surrounding

16 circumstances.") (ellipses and quotation marks omitted); *Wolf v. Superior Court*, 114 Cal. App. 4th

17 1343, 1351 (Cal. App. 2004) (Reversible error for a trial court to refuse to consider such extrinsic

18 evidence on the basis of the trial court's own conclusion that the language of the contract appears to

19 be clear and unambiguous on its face.")

20          Likewise, evidence of intent concerning whether a third party holds third party beneficiary

21 status is relevant and discoverable.  *See Spinks v. Equity Residential Briarwood Apt's*, 171 Cal. App.

22 4th 1004, 1022 (Cal. App. 2009) ("The test for determining whether a contract was made for the

23 benefit of a third person is whether an intent to benefit a third person appears from the terms of the

24 contract."); *Epitech, Inc. v. Kann*, 204 Cal. App. 4th 1365, 1372 (Cal. App. 2012) ("The contracting

25 parties must have intended to confer a benefit on the third party.").  Determining the intent of the

26 parties is not limited to solely the language of the contract, since "an inflexible 'rule that would limit

27 the determination of the meaning of a written instrument to its four-corners merely because it seems

28 to the court to be clear and unambiguous, would either deny the relevance of the intention of the

parties or presuppose a degree of verbal precision and stability our language has not attained.'" *Spinks*, 171 Cal. App. 4th at 1023 (quoting *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (Cal. 1968)).  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  Cal. Civ. Code § 1647.  "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." *Garcia v. Truck Ins. Exch'g*, 36 Cal. 3d 426, 437 (Cal. 1984).  Furthermore, "a court may consider the subsequent conduct of the parties" because "[i]n determining intent to benefit a third party, the contracting parties' practical construction of a contract, as shown by their actions, is important evidence of their intent." *Spinks*, 171 Cal. App. 4th at 1024 (quotation marks omitted).  Discovery as to the course of conduct and intent of the parties to the agreement likely will include discovery of third party, Qualcomm, as well as one or more former Motorola employees.

In addition, Apple has alleged that "Apple has incurred and will continue to incur harm as the result of Motorola's [alleged] anticipatory breach of contract by repudiation."  Apple's Second Amended Complaint, ¶66.  Even a count for alleged breach by repudiation still requires a showing of damage. *See, e.g., Mammoth Lakes Land Acq., LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 462-63 (2010) (in case based on "anticipatory breach of contract," elements of breach were "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff as a result of defendant's breach"); *Rambus Inc. v. Hynix Semiconductor Inc.*, 629 F. Supp. 2d 979, 1013-14 n.2 (N.D. Cal. 2009) (applying same factors) (quoting *Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (Cal. 1968)); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1130 (C.D. Cal. 2002) (same).  Apple has suffered no harm as a result of Motorola's alleged acts, and Motorola seeks discovery to prove it.  Apple's suggestion of bifurcation is merely an attempt to defer Motorola from demonstrating that Apple cannot make out an essential element of its repudiation count.  Motorola should not be precluded from seeking early resolution on this issue.

Another example of the discovery that Motorola needs in support of its defense relates to Apple's Count 5, which seeks a declaration that Motorola's patent rights in the Qualcomm

Gibson, Dunn & Crutcher LLP

Joint Rule 26(f) Report and Discovery Plan          CASE NO.: 12-cv-00355-GPC-BLM

MDM6610 baseband processor are exhausted.  Apple's theory appears to be that the Qualcomm MDM6610 is subject to patent license or other rights at the time of manufacture or sale and that Motorola's patent rights in the MDM6610 baseband processor chips are exhausted by the transfer of such chips to Apple or its contract manufacturers.  Yet, the U.S. law of patent exhaustion has a territoriality requirement.  The Federal Circuit has held that "United States patent rights are not exhausted by products of foreign provenance…To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094, 1105 (Fed. Cir. 2001).  "United States patents are not exhausted as to products that are manufactured and sold in a foreign country, and that importation of such products may violate United States patents." *Id.  See also Ninestar Tech Co., Ltd. v. International Trade Commission*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (reconfirming).  According to Apple's Second Amended Complaint, "Qualcomm CDMA Technologies Asia-Pacific Pte. Ld. ("QCTAP"), alleged to be a wholly owned subsidiary of Qualcomm Incorporated, now sells the MDM6610 baseband to Apple's contract manufacturers, and those components are incorporated into Apple's CDMA2000-compliant iPhone 4S.  Apple also incorporates Qualcomm chips into its new iPad products."  Second Amended Complaint, ¶22.  Thus, Apple's complaint, on its face, makes allegations that will necessitate discovery from Apple, QCTAP, and Apple's "contract manufacturers," as to the locations and circumstances concerning the alleged manufacture and supply of MDM6610 baseband processor chips.  Apple alleges that QCTAP is a foreign company, and Motorola believes that Apple's contract manufacturers are foreign entities.  Motorola expects that discovery from those foreign entities likely will require discovery through the involved and timely process of letters rogatory or letters of request.

Motorola believes that Apple's contention that, to the extent needed, much of the discovery for this case "has likely already been produced in related litigation involving the parties," oversimplifies the situation.  First, while there have been and continue to be a number of cases between Motorola and Apple, they relate to any number of issues having nothing to do with the issues in the present case.  As a result, Motorola expects that Apple likely has produced millions of pages in the other cases that have nothing to do with the specific issues in the present case.  Second,

as Motorola has explained to Apple, law firms other than the one representing Motorola in the present case represent or have represented Motorola in those other cases against Apple.   As a result, Motorola's counsel in the present case has no familiarity with the voluminous productions that Apple or third parties have made in other cases.   Motorola does not want to create unnecessary work for either party to the present case and will continue to discuss the issue of document cross use with Apple, but Motorola does not want to find itself in the position of having Apple point to the millions of pages of irrelevant production in other cases as a basis for rushing this case to trial without an adequate discovery period.

Motorola understands that Apple contends that certain issues can be resolved by stipulation, and Motorola is open to discussing them but presently is unaware of the specific issues that Apple contends can be resolved.   Motorola expects that the parties will discuss those issues.

Finally, Motorola disagrees with Apple's position that damages should be bifurcated.   Apple has established no basis whatsoever for doing so.   Indeed, Motorola contends that Apple will not be able to establish damages or other harm as a result of Motorola's alleged acts, and discovery of facts supporting Motorola's contention may provide a basis for early resolution of the case on that basis.

### C.   Disclosure of Electronically Stored and Other Information

The parties intend to discuss the disclosure of electronically stored information ("ESI") and other information and potentially to enter into a stipulation addressing the collection and production thereof.   Motorola proposes the Agreement regarding the Format of Document Productions, attached hereto as Attachment A.   Apple is open to discussing an agreement and will consider the issue further.

### D.   Claims of Privilege or Protection as Trial-Preparation Materials

The parties intend to negotiate and submit to the Court a proposed Protective Order pursuant to Rule 26(c).

### E.   Changes to Limitations on Discovery

The parties agree that, at present, no changes to the limitations on discovery set forth in the Federal Rules of Civil Procedure are required.

**F.   Other Orders Under Rule 26(c), Rule 16(b), or Rule 16(c)**

As noted above, the parties intend to negotiate and submit to the Court a proposed Protective Order pursuant to Rule 26(c).

In addition, depending on the amount of discovery that may be required for this case, the parties may discuss the need for and content of a Scheduling Order pursuant to Rule 16(b), in which Apple may request a timeline for to file an early motion for summary judgment, as detailed below.

**II.   Early Summary Judgment**

Pursuant to the Court's request during the parties' Early Neutral Evaluation Conference with the Court, held on September 26, 2012, the parties have discussed further the possibility of proceeding with an early motion for summary judgment to resolve some, if not all, issues of liability. However, the parties disagree as to whether such an early motion is appropriate.

**A.   Apple's Position**

Given that the contract at issue is clear and unambiguous, Apple believes that some, if not all, claims in this case are amenable to immediate resolution as a matter of law.  Apple therefore intends to file an early motion for summary judgment as soon as is practicable.

**B.   Motorola's Position**

Apple has made far-reaching allegations, and, as discussed above, Motorola believes that discovery on numerous issues, including the intent behind the contract at issue, alleged damages, the facts concerning the sale of Qualcomm baseband processor chips, among others, will be necessary before the issues in this case can be resolved properly.  Motorola sees Apple's position as one that seeks a rush to judgment without affording Motorola adequate discovery.  Accordingly, should Apple move for summary judgment before Motorola has had the opportunity to take necessary discovery, Motorola will move the Court under the appropriate rules to defer the briefing and ruling on such a motion.

Dated: October 24, 2012

GIBSON, DUNN & CRUTCHER LLP


By:   *s/ Meryl L. Young*
MERYL L. YOUNG (CA SBN 110156)

Gibson, Dunn &
Crutcher LLP

Joint Rule 26(f) Report and Discovery Plan          CASE NO.: 12-cv-00355-GPC-BLM

1

2

3
myoung@gibsondunn.com
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

4

5

6

7

8

9
JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
(admitted *pro hac vice*)
SCOTT A. LESLIE (admitted *pro hac vice*)
sleslie@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212-351-2490
Facsimile:  212-351-6390

10
*Attorneys for Plaintiffs Apple Inc. and*
*Apple Sales International*

11

12
Dated: October 24, 2012

13
WINSTON & STRAWN LLP

14
By:     *s/  Peter J. Chassman*

15

16

17

18
PETER E. PERKOWSKI (CA SBN 199491)
pperkowski@winston.com
333 S. Grand Avenue
Los Angeles, CA 90071-1541
Telephone:  213-615-1819
Facsimile:  213-615-1750

19

20

21

22
JAMES F. HURST (admitted *pro hac vice*)
jhurst@winston.com
MICHAEL L. BRODY (admitted *pro hac vice*)
mbrody@winston.com
35 W. Wacker Drive
Chicago, Illinois  60601-9703
Telephone:  312-558-5600
Facsimile:  312-558-5700

23

24

25

26
PETER J. CHASSMAN (admitted *pro hac vice*)
pchassman@winston.com
1111 Louisiana, 25th Floor
Houston, Texas 77002-5242
Telephone:  713-651-2623
Facsimile:  713-651-2700

27

28
*Attorneys for Motorola Mobility LLC*
*(f/k/a Motorola Mobility, Inc.)*

Joint Rule 26(f) Report and Discovery Plan                 CASE NO.: 12-cv-00355-GPC-BLM

# ATTACHMENT A

ATTACHMENT A

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **APPLE INC. and APPLE SALES INTERNATIONAL,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**MOTOROLA MOBILITY LLC,**<br><br>**Defendant** | Civil Case No. 3:12-cv-00355-GPC-BLM<br><br>**AGREEMENT REGARDING THE FORMAT OF DOCUMENT PRODUCTIONS** |

This Stipulation Regarding the Format of Document Productions shall govern the parties

in the above-captioned case (the "Litigation").

## I.   GENERAL PROVISIONS

**A.**  The parties will make reasonable efforts to prepare responsive and nonprivileged data

for production in accordance with the agreed-upon specifications set forth below.  These

specifications apply to hard copy documents or electronically stored information ("ESI")

which are to be produced in the first instance in this litigation.

**B.   SECURITY**  Both parties will make reasonable efforts to ensure that any productions

made are free from viruses and provided on encrypted media for submission.

**C.   CONFIDENTIALITY DESIGNATION.** Responsive documents in TIFF format

will be stamped with the appropriate confidentiality designations in accordance with the

Protective Order in this matter. Each responsive document produced in native format will

have its confidentiality designation identified in the filename of the native file.

ATTACHMENT A

**D.   NON-STANDARD FILES.** The format of production of non-standard electronic files, large oversized documents, etc. will be discussed before production to determine the optimal production format.

**E.   PRODUCTION MEDIA.** Documents shall be produced on external hard drives, readily accessible computer(s) or electronic media ("Production Media"). Each piece of Production Media shall identify a production number corresponding to the production volume (e.g., "VOL001", "VOL002"), as well as the volume of the material in that production (e.g. "-001", "-002"). Each piece of production media shall also identify: (1) the producing party's name; (2) the production date; (3) the Bates Number range of the materials contained on the Production Media; and (4) the set(s) of requests for production for which the documents are being produced.

**II.   DATA PROCESSING**

**A.   KEYWORD SEARCHING** To the extent that keywords are used in limiting the universe of potentially responsive documents to be reviewed, the parties shall meet and confer to try to develop a mutually agreeable list of search terms and protocols prior to the production of documents. Any search methodology employed must open compound and nested files and de-compression of archives. The search utilities employed must support the use of stemmed searches (e.g. using ~ to include variations on a keyword) and Boolean searches.

**B.   CULLING\FILTERING** Each party will use its best efforts to filter out common system files and application executable files by using a commercially reasonable hash identification process. Hash values that may be filtered out during this process are located in the National Software Reference Library ("NSRL") NIST hash set list. Additional

ATTACHMENT A

culling of system file types based on file extension may include, but are not limited to: WINNT, LOGS, DRVS, MP3, C++ Program File (c) , C++ Builder 6 (cpp), Channel Definition Format (cdf), Creatures Object Sources (cos), Dictionary file (dic), Executable (exe), Hypertext Cascading Style Sheet (css), JavaScript Source Code (js), Label Pro Data File (IPD), Office Data File (NICK), Office Profile Settings (ops), Outlook Rules Wizard File (rwz), Scrap Object, System File (dll), Temporary File (tmp), Windows Error Dump (dmp), Windows Media Player Skin Package (wmz), Windows NT/2000 Event View Log file (evt), Python Script files (.py, .pyc, .pud, .pyw), Program Installers.

**C.** The parties agree to use commercially accessible software to open password-protected or encrypted files.

**D.   DEDUPLICATION** A party is only required to produce a single copy of a responsive document and a party may de-duplicate responsive ESI (based on MD5 or SHA-1 hash values at the document level) across Custodians.   For emails with attachments, the hash value is generated based on the parent/child document grouping.   A party may also de-duplicate "near-duplicate" email threads as follows:   In an email thread, only the final-in-time document need be produced, assuming that all previous emails in the thread are contained within the final message.   Where a prior email contains an attachment, that email and attachment shall not be removed as a "near-duplicate." To the extent that de-duplication through MD5 or SHA-1 hash values is not possible, the parties shall meet and confer to discuss any other proposed method of de-duplication.

## III. PRODUCTION OF HARD COPY DOCUMENTS

**A.   TIFFs.** Documents that exist in hard copy format only shall be scanned and produced as single page Group IV TIFFs, with at least 300 dots per inch (dpi). Each TIFF image

ATTACHMENT A

shall be named according to the corresponding bates number associated with the document. Each image shall be branded according to the bates number and agreed upon confidentiality designation. TIFFs shall show all text and images that would be visible to a user of the hard copy documents.

**B. OCR TEXT FILES.** A commercially acceptable technology for optical character recognition "OCR" shall be used for all scanned, hard copy documents. OCR text shall be provided as a single text file for each document, and the filename itself should match its respective TIFF filename. The text files will not contain the redacted portions of the documents.

**C. DATABASE LOAD FILES/CROSS-REFERENCE FILES.** Documents should be provided with (a) an ASCII delimited data file (.txt, .dat, or .csv), and (b) an image load file that can be loaded into commercially acceptable production software (e.g., Concordance, Summation). Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load file(s) in the production.

**D. CODING FIELDS.** The following information shall be produced in the delimited data file accompanying hard copy documents: (a) BEGBATES, (b) ENDBATES, (c) CUSTODIAN, (d) CONFIDENTIALITY, and (e) REDACTED.

**E. BATES NUMBERING**. All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The bates numbering should start with values to be agreed upon by the parties.

ATTACHMENT A

F. **UNITIZING OF DOCUMENTS.** In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, paper documents should be logically unitized).  The parties will use reasonable efforts to unitize documents correctly.

G. **IDENTIFICATION OF PAPER DOCUMENTS.** The parties will utilize best efforts to ensure that paper records for a particular Custodian that are included in a single production are produced in consecutive Bates stamp order. The parties will identify which documents in a production are scanned paper documents either in the cover letter accompanying the production or in a coding field titled "Paper (Y/N)."

## IV. PRODUCTION OF ELECTRONICALLY STORED INFORMATION

A. **METADATA FIELDS AND PROCESSING.**  Each of the metadata and coding fields set forth in Appendix 1 that can be extracted shall be produced for that document. The parties are not obligated to populate manually any of the fields in Appendix 1 if such fields cannot be extracted from a document, with the exception of the following: (a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH; (e) CUSTODIAN, (f) CONFIDENTIALITY, and (g) REDACTED, which should be populated by the party or the party's vendor.  The parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents are correct, however, the parties acknowledge that such metadata may not always be accurate and might instead contain irrelevant or incorrect information generated during the collection process.  Parties may request other native files be produced as described in Section IV.I. below.

ATTACHMENT A

**B. TIFFs.** Unless excepted below, single page Group IV TIFFs should be provided, at least 300 dots per inch (dpi). Each TIFF image file should be one page and named according to the unique bates number, followed by the extension ".TIF". Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape).

**C. TEXT FILES.** For each document, a text file should be provided along with the image files and metadata. The text of native files should be extracted directly from the native file. However, if a document has been redacted or does not contain extractable text, OCR of the redacted document will suffice in lieu of extracted text.

**D. DATABASE LOAD FILES/CROSS-REFERENCE FILES.** (a) an ASCII delimited data file (.txt, .dat, or .csv), and (b) an image load file that can be loaded into commercially acceptable production software (e.g., Concordance, Summation). Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load file(s) in the production. The total number of documents in a production should match the total number of records in the database load file. Each TIFF in a production must be referenced in the corresponding image load file. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production.

**E. BATES NUMBERING.** All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The bates numbering should start with values to be agreed upon by the parties.

ATTACHMENT A

**F. PRESENTATIONS.** The parties shall take reasonable efforts to process presentations (MS PowerPoint, Google Presently/Punch) with hidden slides and speaker's notes unhidden, and to show both the slide and the speaker's notes on the TIFF image.

**G. SPREADSHEETS.** TIFF images of spreadsheets need not be produced unless redacted, in which instance, spreadsheets will be produced in TIFF with OCR. Native copies of spreadsheets should be produced with a link in the NativeLink field, along with extracted text and applicable metadata fields set forth in Appendix 1. A TIFF placeholder indicating the document was provided in native format should accompany the database record. If a spreadsheet has been redacted, TIFF images and OCR of the redacted document will suffice in lieu of a native file and extracted text. The parties will make reasonable efforts to ensure that any spreadsheets that are produced only as TIFF images are formatted so as to be readable.

**H. PROPRIETARY FILES.** To the extent a response to discovery requires production of ESI accessible only through proprietary software, the parties should continue to preserve each version of such information. The parties shall meet and confer to finalize the appropriate production format.

**I. REQUEST(S) FOR ADDITIONAL NATIVE FILES.** If good cause exists to request production of specified files, other than those specifically set forth above, in native format, the party may request such production and provide an explanation of the need for native file review, which request shall not unreasonably be denied. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields.

ATTACHMENT A

**J.   REDACTION OF INFORMATION** If documents are produced containing redacted information, the producing party shall supply a list of the documents for any such claim(s) of privilege, indicating the grounds for the redaction and the nature of the redacted material (e.g., privilege, trade secret, privacy). During the course of the litigation, an electronic copy of the originally, unredacted data shall be securely preserved in such a manner so as to preserve without modification, alteration or addition the content of such data including any metadata therewith. If scanning is necessary to create a redacted version of a document, the producing party shall produce a corresponding load file identifying the custodian from whom the document was collected and such documents shall subject the TIFF files to Optical Character Recognition ("OCR") process if the TIFF files do not already have extractable text, such that the processed files become searchable.

## V.   PROCESSING OF THIRD-PARTY DOCUMENTS

**A.**   A party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Stipulation with the subpoena and state that the parties to the litigation have requested that third-parties produce documents in accordance with the specifications set forth herein.

**B.**   The Issuing Party shall produce any documents obtained pursuant to a non-party subpoena to the opposing party.

**C.**   If the non-party production is not Bates-stamped, the Issuing Party will endorse the non-party production with unique prefixes and Bates numbers prior to producing them to the opposing party.

ATTACHMENT A

**D.** Nothing in this stipulation is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the parties or third-parties to object to a subpoena.

**VI.      SEARCHING**

**A. Custodial Production.** The parties shall meet and confer to develop a list of custodians and search terms with which the parties will conduct electronic searches using such agreed search term lists of custodial documents.  Each requesting party shall limit its request for custodial production to a total of five custodians per producing party.  The parties may jointly agree to modify this limit without the Court's leave.  In the absence of such agreement, the requesting party may petition the Court for up to five additional custodians per producing party, upon a showing of a distinct need.

Search terms will be employed for the searching of custodial data.  The total search terms will be narrowly tailored to particular issues and limited to five terms (or as otherwise modified by agreement by the Parties).  A conjunctive combination of multiple words or phrases (e.g., "computer" and "system") narrows the search and shall count as a single search term.  A disjunctive combination of multiple words or phrases (e.g., "computer" or "system") broadens the search, and thus shall count as a separate search term unless they are variants of the same word.  Should a party serve custodial production requests or search term lists beyond the limits agreed to by the Parties or granted by the Court pursuant to this paragraph, the requesting party shall bear all reasonable costs caused by such additional discovery.

**B. Locations That Will Be Searched for Responsive Documents.**  The parties will search any electronic files or folders, or other parts of media, including any internal and external hard drives and other ESI venues (including, but not limited to, recordable

ATTACHMENT A

optical media, media cards, thumb drives, non-volatile memory, floppy disks, work desktop and laptop computers, email servers, intranet servers, network shares, public data shares and/or database servers) for each identified Custodian that the Custodian reasonably anticipates may contain non-duplicative Responsive Documents.

The parties agree to search central repositories, including central databases, or relevant portions thereof to the extent that the party reasonably anticipates they contain non-duplicative Responsive Documents.  The parties agree to meet and confer to limit the scope of production from central repositories if the search of central repositories (or relevant portions thereof) that the producing party anticipates contain Responsive Documents is unduly burdensome or is likely to be unreasonably inefficient in identifying relevant documents.  Specifically, the parties recognize that certain repositories, by their nature, may not effectively or reasonably be searched using electronic search strings, and the parties agree to notify each other of any such repositories that contain Responsive Documents. The parties will then meet and confer to discuss the collection of Responsive Documents from such repositories, including potentially using other effective collection methodologies.

**C.  Locations That Will Not Be Searched for Responsive Documents.**  The following locations will not be searched under any circumstances, and as such need not be preserved: information stored on personal digital assistants, mobile phones, voicemail systems, instant messaging systems, and automated disaster recovery backup systems and/or disaster recovery backup tapes.  In addition, the parties agree that only sent and received custodial emails will be searched.  Notwithstanding the foregoing, the parties agree that Responsive Documents that a Custodian indicates are stored on an archival

ATTACHMENT A

storage medium that the Custodian can readily identify and locate, that cannot be located in any other repository of information, and that can reasonably be searched, will be searched.  In addition, nothing in this paragraph shall limit a receiving party's right to request from a producing party more information about the nature of and burden associated with obtaining documents from a particular location. The parties further recognize their obligations to preserve any potentially relevant sources of data, whether live or in archival form, for purposes of this litigation.

D. **Source Code.**  To the extent relevant to the Litigation, source code will be made available for inspection pursuant to the terms of the Protective Order.  The parties agree that the search terms will not be applied to source code.

## VII. MISCELLANEOUS PROVISIONS

A. **Objections Preserved.**  Nothing in this protocol shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

B. **No Effect on Cost Shifting.** Nothing in this Agreement shall affect, in any way, a producing party's right to seek reimbursement for costs associated with collection, review, and/or production of documents or ESI.

C. **No Waiver**.  Pursuant to Federal Rule of Evidence 502(d), the inadvertent production of a privileged or work product protected ESI is not a waiver in the pending case or in any other federal or state proceeding.  Moreover, the mere production of ESI in a litigation as part of a mass production shall not itself constitute a waiver for any purpose.

ATTACHMENT A

# <u>Appendix 1: ESI Metadata and Coding Fields</u>

**A. Image Load File** shall contain the following comma-delimited fields:
BEGBATES, VOLUME, IMAGE FILE PATH, DOCUMENT BREAK, FOLDER BREAK, BOX BREAK, PAGE COUNT

**B. Metadata Load File** shall be delimited according to the following characters:
       o Delimiter = D(ASCII:0020)
       o Text-Qualifier = þ (ASCII:00254)

**C.** The following fields will appear in the metadata load file in the order displayed below:

| Field Name | Field Description |
|---|---|
| BEGBATES | Beginning Bates number as stamped on the production image |
| ENDBATES | Ending Bates number as stamped on the production image |
| BEGATTACH | First production Bates number of the first document in a family |
| ENDATTACH | Last production Bates number of the last document in a family |
| CUSTODIAN | Individual from whom the documents originated |
| NATIVELINK | Native File Link (Excel files only) |
| SUBJECT | Subject line of email |
| DATESENT | Date email was sent (format: MM/DD/YYYY) |
| TIMESENT | Time email was sent |
| TO | All recipients that were included on the "To" line of the email |
| FROM | The name and email address of the sender of the email |
| CC | All recipients that were included on the "CC" line of the email |
| BCC | All recipients that were included on the "BCC" line of the email |
| AUTHOR | Any value populated in the Author field of the document properties |
| FILENAME(Edoc only) | Filename of an electronic document |
| DATEMOD (Edoc only) | Date an electronic document was last modified (format: MM/DD/YYYY) |
| DATECREATED (Edoc only) | Date the document was created (format: MM/DD/YYYY) |

**CERTIFICATE OF SERVICE**

I, the undersigned, declare:

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 3161 Michelson Drive, Irvine, California 92612-4412.

On October 24, 2012, I caused the following documents to be sent via electronic mail and the ECF system to all counsel of record in this action:

**JOINT RULE 26(f) REPORT AND DISCOVERY PLAN – REDACTED PUBLIC VERSION**

I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.

Executed on October 24, 2012, at Irvine, California.

By:   */s/  Meryl L. Young*                              
        Meryl L. Young

Gibson, Dunn &
Crutcher LLP